STATE OF MAINE  
HANCOCK, SS.

SUPERIOR COURT  
CIVIL ACTION  
Docket No. CV-99-38

Robert DeSimone et al.,  
      Plaintiffs/Counterclaim Defendants

v.

Lisa MacQuinn-Tweedie et al.,  
      Defendants/Counterclaim Plaintiffs/  
      Third-Party Plaintiffs

Decision and Judgment

v.

DONALD L. GARBRECHT  
LAW LIBRARY

MAR 27 2003

David Witham,  
      Third-Party Defendant

A trial on all claims that remain pending in this action was held on August 14, 15, 16 and September 2, 2002. On each hearing date, all parties and counsel of record were present. Following the presentation of evidence, the parties submitted written argument, which the court has reviewed and considered.

**A. Procedural background**

This action was commenced in May 1999 when the plaintiffs filed a two-count complaint. Both claims relate to the disposition of a Bar Harbor motel and the 8 acre parcel of real estate on which the motel is located. In count 1, the plaintiffs sought a declaration of the parties' rights and liabilities based on allegations that, under an instrument dated March 2, 1999 and entitled "Agreement for Lease of Park Entrance

1

Motel and Purchase of 3.01 Acre Pt. Parcel," they were contractually entitled to exercise an option and purchase a portion of the realty (the 3 acre parcel described as the "point parcel"). They further alleged that pursuant to the agreement they had a leasehold interest in the hotel and the 5 acres, which adjoins the point parcel, on which the motel is located. The plaintiffs also sought to enforce an arbitration provision in the agreement that they claimed was triggered by the parties' dispute regarding the property (count 2). In their responsive pleadings, the defendants contested the plaintiffs' claims for relief. Additionally, the defendants filed a counterclaim that included claims for a declaration that the March 2 agreement was invalid and unenforceable (count 1) and for money damages based on claims of slander of title (count 2) and interference with an advantageous contractual relationship (count 3).[1] These claims are based on allegations that the plaintiffs filed a *lis pendens* with the Hancock County Registry of Deeds, providing record notice of the parties' dispute regarding the fate of the real estate. The defendants also initiated a third-party claim against David Witham, whom the defendants alleged was a partner of the plaintiffs in the relevant transactions. The defendants' claims against Witham, brought against him in his capacity as a partner of the plaintiffs, were identical in substance and structure to those set out against the plaintiffs in the counterclaim.

In their pleading that was responsive to the counterclaim, the plaintiffs and the third-party defendant asserted a variety of claims against Peter Roy, Esq. and his law firm.[2] The claims consisted of defamation, abuse of process, intentional and negligent infliction of emotional distress, and tortious interference with contractual relationship. Roy and the law firm moved to dismiss all counts asserted against them. Pursuant to 14 M.R.S.A. § 556 and common law principles, that motion was granted, all of those claims

---

[1] In this opinion, Lisa Tweedie (who appears to use both that name and the hyphenated, MacQuinn-Tweedie), James Tweedie and the New Park Entrance Corporation will be described as "the defendants" (even though they also have the role of counterclaim plaintiffs), and Robert J. DeSimone and Robert W. Macomber, Jr. will be referred to as "the plaintiffs" (even though they actually are the counterclaim defendants).

[2] As originally framed, those claims were brought only by plaintiff Macomber. The pleading was amended in December 1999 to include claims by Macomber, DeSimone and Witham.

2

were dismissed, and the plaintiffs and Witham were ordered to pay attorney's fees of $20,000.[3] Attempts by the plaintiff and Witham to amend the pleadings filed against Roy and his law firm were unsuccessful, and thus Roy and his firm are no longer parties to this action.[4]

While this case has been pending, a foreclosure action involving the 8 acre motel property was pending and adjudicated in the District Court. The court entered a judgment of foreclosure in favor of the mortgagee, Union Trust, and in March 2001, the Law Court affirmed that judgment. *See Union Trust v. MacQuinn-Tweedie*, 2001 ME 43, 767 A.2d 289. In that judgment, the District Court ordered a sale of the mortgaged premises. The plaintiffs at bar had participated in that proceeding as parties in interest. In light of the resolution of that related action, in this case the defendants moved to dismiss the plaintiffs' claims against them. The court granted that motion because any interest that the plaintiffs may have had in the property was extinguished by the foreclosure sale. As is noted in the court's order, the plaintiffs did not challenge the defendants' contention that the declaration they sought in their complaint was no longer possible and that consequently there was no reason to proceed to arbitration to address the dispute arising from the March 2 agreement. The court further rejected the plaintiffs' attempts to cast their action as one for breach of that contract. This resulted in a dismissal of all of the plaintiffs' claims against the defendants. As result of this[5] and prior orders entered in this case, the sole unadjudicated claims are the defendants' claims against the plaintiffs and Witham for slander of title and interference with contractual relations, and those claims were the subject of the trial noted above.

## B. Findings of fact

---

[3] Under the provisions of M.R.Civ.P. 54(b), that obligation (which was joint and several among the three parties who filed the claims against Roy and the firm) would not be enforceable until a final judgment was entered on all claims filed in this case.

[4] Roy, however, remains counsel of record for the defendants.

[5] As part of the same order, the court denied Witham's motion for summary judgment that was based on his contention that, as a matter of law, he cannot be held liable for any of the conduct attributed to the plaintiffs.

The focus of this litigation is the Park Entrance Motel and the 8 acre parcel of real estate associated with it. Defendant Lisa Tweedie received a partial interest in that asset from one or both of her parents. In 1988, the plaintiffs, who were active in the local community as, among other things, commercial real estate brokers, obtained an ownership interest in the motel, acquiring that interest from a member of Lisa's family. The plaintiffs held that interest through several corporations in which they were principals. During the following few years, the plaintiffs and Lisa alternated management responsibility on an annual basis. In 1993, the then-mortgagee bank, Key Bank of Maine, commenced a foreclosure action involving the motel property, and that action was resolved by agreement three years later. That agreement was memorialized in two instruments, the second of which was a revision of the first. Defendants' exhibits 2, 3.[6] In one of its effects, that agreement restructured the business relationship between, on the one hand, Lisa and her husband, defendant James Tweedie,[7] and, on the other hand, the plaintiffs. Among other things, the plaintiffs divested themselves of any interest in the motel business and in most of the tangible and intangible property associated with it.[8] Further, Lisa granted to the plaintiffs an option to purchase a portion of the 8 acre parcel of realty on which the motel was situated. Defendant's exhibit 3, ¶ 4. The option property, which is the "point parcel," is 3 acres in size. In the original agreement, the parties noted that a survey was underway to define the boundaries of the new lot. Defendants' exhibit 2, ¶ 4. Two months later, the plaintiffs recorded a memorandum of this option in the Hancock County Registry of Deeds. Defendant's exhibit 5. That filing included the boundary description for the point parcel. *Id.*

The 1996 agreement included a provision for mandatory arbitration in the event of a dispute:

---

[6] In the second, "revised" agreement, the parties integrated the terms of the original instrument to the extent that any such terms did not conflict with those of the second. Defendants' exhibit 3, ¶ 20.

[7] At least at the time of trial, James had an ownership interest in the motel business but not in the real estate itself. Lisa owned the real estate exclusively

[8] Several small structures that are located on the point parcel were to be conveyed to the plaintiffs when they exercised their option to acquire the parcel itself. Defendants' exhibit 3, ¶ 13.

4

The parties each agree that in the event of a dispute as between them relating to the substance of this Agreement, or with respect to matters described herein, or subject hereto, that such disputes shall be resolved by binding arbitration in accordance with the applicable provisions of the Maine Uniform Arbitration Act, 14 M.R.S.A. Statute 5927 et. seq. as the same may be amended.

Defendants' exhibit 3, ¶ 17.

In order to accomplish the financial provisions of the 1996 agreement, the Tweedies and New Park Entrance Motel (a corporate entity) secured mortgage loan proceeds from Union Trust Bank. The amount borrowed was well in excess of $2 million. The mortgage issued to Union Trust securing that loan extended to the entire 8 acre parcel, which included the point parcel. Under the terms of the 1996 agreement, the terms of the plaintiffs' option obligated the Tweedies to satisfy the conditions of the mortgage, with the ultimate goal of permitting Union Trust to release the portion of the secured premises that constituted the point parcel. Defendants' exhibit 7. The plaintiffs then would be in a position to exercise their option, which required payment of roughly $260,000 to the Tweedies. *Id.* The parties' agreement included provisions that would be activated if the Tweedies defaulted on their mortgage obligation to Union Trust and provided some level of protection to the plaintiffs, because such a default would compromise the plaintiffs' rights under the option.[9] Defendants' exhibit 4, ¶ 7. Indeed, although the parties plainly envisioned a partition of the 8 acre parcel as part of the future transaction triggered by the plaintiffs' exercise of their option, in fact that partition was never effected, and the 8 acres has always taken the form of a single parcel – even when it was conveyed as a result of the foreclosure sale.

Toward the beginning of 1998, the Tweedies and the motel fell into default on the mortgage with Union Trust. The Tweedies and the motel, as mortgagors, acknowledged the number and nature of the defaults in a written agreement with Union Trust under which the mortgagee agreed to forebear from pursuing its rights. *See* plaintiffs' exhibit 4. The defaults evidence financial problems with the operation of the motel; those defaults

---

[9] In fact, the mortgagors did default, *see* plaintiffs' exhibit 4, ¶ 1. Union Trust as the mortgagee commenced a foreclosure action, a judgment of foreclosure was issued, and the plaintiffs' option rights were extinguished. *See Union Trust v. MacQuinn-Tweedie*, 2001 ME 43, 767 A.2d 289.

5

included excessive indebtedness, insufficient operating funds for the business, unpaid taxes and unauthorized disposition of the loan proceeds. *Id.*, ¶ 1. More as a mechanism to protect its security that as evidence of the motel's success,[10] the bank loaned the mortgagors an additional $277,000, which was specifically earmarked for renovations "to make the motel property more attractive and competitive and enhance the value of the Bank's collateral." *Id.*, ¶ 2.

One of the protections that the plaintiffs secured in the 1996 agreement was the right to be notified if the Tweedies defaulted on the mortgage that was secured in part with the point parcel. Defendants' exhibit 3, ¶ 7. In fact, the plaintiffs were advised of the mortgage-related problems that Lisa and James were facing, and the attorneys for the plaintiffs (John McArdle) and the Tweedies (Peter Roy) began a long and often difficult course of communications regarding the status of the motel and their clients' rights and obligations. The correspondence relevant to this case largely revolved around the plaintiffs' request for information relating to the defaults, the status of the mortgage affecting the entire property (including the point parcel) and the plaintiffs' concern that the Tweedies were in discussions with Thomas Walsh and his corporation, Ocean Properties, Ltd. (Walsh had a right of first refusal to acquire the motel property (excluding the point parcel), *see* defendants' exhibit 6,[11] but the parties' agreement prohibited any of them from negotiating with Walsh. *See* defendants' exhibit 2, ¶ 20. Rather, his involvement was limited to a right to notice of any proposed sale and a right to match the terms of any such transaction. *See* defendants' exhibit 6. This restriction was included at Lisa's insistence.) Further, during the summer of 1998, the plaintiffs learned that Lisa, in comments she made to Witham, had expressed an intention to prevent the plaintiffs from exercising their option to acquire the point parcel.

Through McArdle, the plaintiffs persisted in efforts, direct and indirect, to persuade Union Trust to release its mortgage interest in the portion of the motel property that was subject to the plaintiffs' option (namely, the point parcel). *See, e.g.,* plaintiffs' exhibits 91, 93. These efforts were obviously motivated by the plaintiffs' exposure to

---

[10] *See* "Final Argument and Memorandum of Counterclaim Plaintiffs" at p. 3.

[11] The point parcel was expressly excluded from the parameters of Ocean Properties' right of first refusal. Defendants' exhibit 6, ¶ 2(d)(i).

losing the option if the bank exercised its rights under the mortgage agreement based on the Tweedies' default. Unless and until the bank released its interest in the point parcel, it was subject to foreclosure by the bank. In fact, despite the Tweedies' obligation to exert reasonable efforts to induce the bank to release its interest, *see* defendants' exhibit 3, ¶ 21, as of October 2, 1998, the Tweedies had not done so. Plaintiffs' exhibit 94.

Early on in the communications between counsel – no later than a letter dated March 12, 1998 -- , McArdle made reference to the arbitration provision of the 1996 agreement. Plaintiffs' exhibit 85 at p.4. That suggestion was reiterated in a letter sent to Roy in June 1998. Plaintiffs' exhibit 5. Counsel for the parties got to the point where they had agreed to seek the mediating services of Peter DeTroy, Esq. During the written colloquy relevant to that issue, Roy wrote in a letter sent to McArdle in July 1998:

> I have no particular objection to arbitration, but unless and until the Union Trust Company agrees to release the property, it strikes me as a waste of time and money. . . .

> I have no objection to arbitration if that is what you think will resolve this matter, and Peter DeTroy is obviously well suited to be the arbitrator. We obviously ought to talk about this before either of us heads off with rifles.

Plaintiffs' exhibit 11. More letters regarding arbitration followed. *See* plaintiffs' exhibits 12, 13. On December 4, 2002, Roy wrote that he was "more than happy to send you a letter confirming that Mr. and Mrs. Tweedie are willing to participate in binding arbitration. The only question I have is how do you intend to factor the bank into this." Plaintiffs' exhibit 15. McArdle responded that he and the plaintiffs "look forward to proceeding through the process with you and the Tweedies in an orderly, businesslike fashion." Plaintiffs' exhibit 16. Viewed in the context of the ongoing flow of letters, "the process" clearly was a reference to arbitration.

McArdle, on behalf of all of the parties to the dispute, then sent a letter to DeTroy confirming the parties' interest in arbitration, soliciting his interest in serving as the mediator and calling his attention to a potential conflict. Plaintiffs' exhibit 104. DeTroy responded by letter dated December 14 and agreed to arbitrate the dispute, subject to execution of conflict waivers. Plaintiffs' exhibit 20. DeTroy anticipated that the parties would submit their claims to him either in written or testimonial form but deferred to

counsel regarding the mechanism of submission. *Id.* McArdle then sent several letters to Roy regarding the arbitration process. Plaintiffs' exhibits 24, 25. After McArdle reminded Roy that Roy had not responded as promptly as he intended, Roy advised McArdle that he agreed to the arbitration procedure that McArdle had proposed but expressed concern about whether the Tweedies could afford DeTroy's services. Plaintiff's exhibit 26. He continued, "Nor, does it make any sense to me to proceed with this matter until and unless something has been worked out with the banks which hold the mortgage on the property. . . .I don't see where arbitration is going to get us anywhere until we have things straightened out with the bank." *Id.* Counsels' last contact with DeTroy was a telephone conference during which Roy stated that he would not agree "to arbitrate anything." McArdle responded that he would file a motion to compel arbitration.

On a separate stage, sometime in 1997 or 1998, the plaintiffs renewed contact with Witham, who is an innkeeper with local business interests and whom the plaintiffs had met a number of years earlier when Witham acquired a hotel property that they had brokered. During those early years of their relationship, Witham knew that the plaintiffs had an ownership interest with the Tweedies in the Park Entrance Motel. Witham had assured the plaintiffs that Lisa Tweedie "knew what she was doing." After the plaintiffs acquired the option on the point parcel, they approached Witham and told him that when they exercised the option and acquired the property, they wanted to have financial backing from an investor. Witham told them to let him know if and when they obtained the property and were in a position to move forward.

In late 1998, the Tweedies had listed the motel for sale with a local real estate agency. In January 1999, at the same time when the plaintiffs intensified their efforts to persuade Union Trust to release the point property from the Tweedies' mortgage, the plaintiffs again went to Witham and expressed their interest in consolidating their rights to the point parcel with the existing motel operation, if they would be able to acquire the latter. The plaintiffs did not have enough cash to finance their plans. However, they had the option to purchase the point parcel for an amount of money that was far less than its market price. Witham, who had the financial wherewithal that the plaintiffs did not, expressed an interest in the plan. With the plaintiffs' assistance based on their

managerial experience at the motel, he proceeded to conduct a due diligence financial assessment of the motel business and its place and potential in the local market. These studies related both to the development of the point parcel as well as assumption of management of the existing motel. In this investigation, Witham regarded the plaintiffs as his "partners in the venture. . . ." Defendants' exhibit 12, ¶ 5. Further, in the complaint that initiated this proceeding, the plaintiffs alleged that Witham was their partner in their efforts to develop this plan. Complaint at ¶ 15.

During much of this period of time, Witham was out of the country. At the outset, negotiations regarding the possible disposition of the motel and the associated 5 acre parcel (that is, the portion of the entire 8 acres that was not subject to the plaintiffs' option on the point parcel) were carried out mostly between the plaintiffs and James Tweedie. Lisa Tweedie was not centrally involved in those initial discussions themselves because of animosity she held toward DeSimone in particular. Nonetheless, because she was the sole owner of the real estate on which the motel was located, she was not on the periphery of these events. Thus, James kept her apprised of the status of communications with the plaintiffs, and to a significant extent, James was a conduit from the plaintiffs to Lisa. As time went on, Witham and Lisa had an increasing amount of direct contact with each other. During those communications, Lisa made specific, substantive proposals regarding the terms of the prospective transaction. Thus, she clearly was active in the formation of the agreement that ultimately was reached. The plaintiffs were also abreast of developments; when Witham and Lisa discussed certain issues, the plaintiffs (or one of them) would provide James with a written memorialization of that proposal soon after. Witham and the plaintiffs were fully aware that Ocean Properties held a right of first refusal on the purchase of the 5 acre motel property. In order to avoid triggering this interest, the transaction involving Witham was cast in the form of a long-term lease.[12]

_____

[12] Under the right of first refusal granted to Ocean Properties, the Tweedies were obligated to notify Ocean Properties of an offer on the motel and make certain representations about their relationship with the "purchaser." Defendant's exhibit 6, ¶ 2(a). Macomber testified that he construed that to mean that only a sale of the motel property – rather than a long-term lease of it – would trigger Ocean Properties' rights under its agreement with the Tweedies. For purposes of the claims at issue here, it is not necessary to resolve whether this construction, which was adopted by Macomber and others, was correct.

The parties believed that the creation of a leasehold would not activate Ocean Properties' right of first refusal and that it would remain out of the picture, thus allowing Witham and the plaintiffs to move forward with their plans to operate the motel and develop the point parcel after the plaintiffs exercised their option to acquire it.

Finally, on March 2, 1999, the Tweedies (in their individual capacities and as representatives of the New Park Entrance Corporation) and Witham executed an agreement for a 99 year lease of the motel and for Witham's purchase of the point parcel. Defendant's exhibit 9. In its final form, the instrument was drafted by DeSimone. However, neither of the plaintiffs was a party to the agreement. The agreement does not include any specific reference to the plaintiffs' option rights regarding the point parcel, but the purchase price allocated to the point parcel is comparable to the price the plaintiffs would be obligated to pay upon execution of their option under the 1996 agreement. Under the terms of the agreement, no later than March 16, 1999, the parties were to execute a lease contract for the motel property and close on the conveyance of the point parcel. The March 2 agreement includes the following arbitration clause:

> Tweedie and Witham agree that, in the event of any dispute between them relating to the substance of this Agreement, the Lease Agreement to be executed on or before March 16, 1999, other such additional necessary documents to be executed, or with respect to matters described herein, or subject hereto, such disputes shall be resolved by binding arbitration in accordance with the applicable provisions of the Maine Uniform Arbitration Act, 14 M.R.S.A. Statute 5927 et. Seq. [sic] as the same may be amended. . . .

*Id.*, ¶ 18. The agreement was signed by Lisa MacQuinn-Tweedie, James Tweedie and Witham. The plaintiffs were not signatories to the agreement because although they had not formalized their business relationship with Witham, they were confident that they would move forward in concert with Witham, who would hold the majority interest among the three. As is required by the agreement, *see id.*, ¶ 2A, Witham paid the Tweedies $10,000 as a nonrefundable deposit.

The defendants contend that the March 2 agreement was the culmination of the plaintiffs' efforts to wrongfully induce them (the Tweedies) into signing the document. Among other things, the defendants claim that one or both of the plaintiffs promoted James' drug addiction by assisting him in his efforts to obtain cash that he used to buy

10

drugs and then to acquire the drugs themselves. The record does reveal that James had a serious addiction. In the middle of March, he was admitted to Acadia Hospital in Bangor for inpatient therapy that continued for about one week. This admission was preceded by an arrest. From those circumstances and other evidence, there is support for the Tweedies' claim that they were beset by financial hardship at the time. The evidence, however, establishes that the March 2 agreement was the product of a careful, deliberate and legitimate negotiation process, the most important portions of which were conducted by Lisa and Witham. Copies of written correspondence between them demonstrate that Lisa and Witham were attentive to important financial and structural issues implicated by the prospective transaction. *See* defendant Witham exhibits 11-15. This is not reflective of a hazy and impulsive move toward the proposed transfer, and in fact the evidence belies any such suggestion. For example, Lisa advised Witham that she was in contact with her accountant regarding issues as particular as the real value of a large payment that, under one of the proposals, Witham would be required to make in the future. Defendant Witham exhibit 12. Lisa also expressed an interest in larger periodic payments in the near term, which she would then use as a basis for investments that would benefit "our children and grandchildren." Defendant Witham exhibit 13. Lisa also paid attention to the tax implications of the proposed transaction. Defendant exhibit 14. Thus, she contributed mature reflection to a complex business deal. There is no suggestion that Lisa herself was beset by drug problems or that she was impaired for some reason. Indeed, the evidence demonstrates the contrary. Whatever residual knowledge of and involvement the plaintiffs may have had in James' personal problems is therefore not material to this case, and the court need not and does not address it.

Further, both prior and subsequent to March 2, Roy was aware of the ongoing negotiations between the Tweedies, and Witham and the plaintiffs. *See, e.g.,* plaintiffs' exhibit 67 (January 29, 1999, letter from Roy to the defendants' accountant soliciting advice on several specific terms that the parties were discussing); plaintiffs' exhibit 71 (February 25 letter from Roy to the accountant requesting information regarding tax issues and noting, "The bottom line is that I suspect they have already cut the deal and are excited about going forward with this. . ."); plaintiffs' exhibit 70 (fax sent by the plaintiffs to Roy on February 26, enclosing a draft of the agreement that was signed on

11

March 2); plaintiffs' exhibits 31, 36, 79 (communications regarding negotiations subsequent to March 2).

Approximately one week after the March 2 agreement was signed, DeSimone forwarded copies of the proposed lease instrument to James and Roy. At some point after that, the Tweedies indicated that they would not go forward with the transaction. Lisa wanted Witham to provide indemnification against any claim that Ocean Properties might make in response to the creation of the leasehold. Witham, still convinced that the lease arrangement did not implicate Ocean Properties' right of first refusal, declined to agree to that term. The Tweedies also had concerns about the tax effects of the transaction. Very shortly after he was discharged from Acadia, on March 23 James Tweedie left a message on Macomber's telephone answering machine: "You guys will never see the option land again. Understand?"

Although the parties had focused their negotiations on the prospects of a long-term lease, it is important to note that when the parties had difficulties coming to terms for that type of arrangement, they were also discussing the possibility of an outright sale of the 5 acre motel property and the motel itself to Witham and/or the plaintiffs. The core of the Tweedies' argument in this case is that the plaintiffs and Witham had the exclusive objective of a long-term lease in order to try to avoid triggering Ocean Properties' right of first refusal, which, under the 1996 agreement prohibiting the parties from dealing directly with that entity, is the only way in which Ocean Properties could have become involved. If the Tweedies conveyed the motel and the associated property to a third party such as Witham or the plaintiffs, then Ocean Properties could undermine that transaction by asserting its right of first refusal. The parties recognized that Ocean Properties had the financial capacity to acquire the motel.

Witham and the plaintiffs were fully aware of the implications of a sale rather than the lease of the motel. However, the record clearly demonstrates that as an alternative form of the transaction, when problems arose regarding the prospective lease the plaintiffs and Witham considered an outright purchase of the 5 acre hotel parcel. For example, on March 22, the plaintiffs sent Roy a proposed purchase and sale agreement contract for the motel and the 5 acres associated with it. Plaintiffs' exhibit 31. On March 31, Roy initiated contact with DeSimone and noted that Lisa Tweedie in fact was willing

12

to sell the entire property and motel. Plaintiffs' exhibit 36. Previously, Roy consulted with the motel's accountant regarding terms under discussion for the "purchase" of the motel. Plaintiffs' exhibit 79. This corroborates Macomber's trial testimony that the plaintiffs did not view the prospective long-term lease between the Tweedies and Witham as the only acceptable arrangement. Beyond that, an agreement to sell the motel property to Witham might have been subverted if Ocean Properties chose to exercise its rights. Nonetheless, such an effect still would inure to the plaintiffs' benefit, presumably because the Union Trust mortgage would be extinguished or at least restructured. Then, because the mortgagee's security interest in the point parcel could be released, the plaintiffs could exercise their option rights to that lot, and they would be in a position to develop their interest. Even with this possibility, however, the plaintiffs were not prepared to surrender the opportunity that they and Witham in fact would have to acquire the motel, which would happen if Ocean Properties elected not to exercise its right of first refusal. For that reason, on March 23, McArdle, who believed that Roy was dealing directly with Ocean Properties, wrote a sharp letter to Roy objecting to any such contact and sales efforts. Plaintiffs' exhibit 32. In that letter, McArdle specifically noted that in his view, that conduct was violative of the provisions of the 1996 agreement.

The plaintiffs kept Witham posted about the delays and difficulties in the transaction. As result of this information, Witham lost interest in pursuing the matter, concluding that if the Tweedies did not want to go forward with the deal, he did not want to play a part in it. His communications with Lisa tailed off by the end of the month. In early April, he assigned all of his rights and interest in the matter to the plaintiffs. Defendants' exhibit 11.[13]

The plaintiffs were concerned that the March 23 telephone message from James also might mean that he and Lisa were attempting to convey the property to Ocean Properties (the land and business were still listed for sale), despite the provision in the 1996 agreement noted above. *See also* plaintiffs' exhibit 32. As a result of that concern, DeSimone prepared a *lis pendens*. He and Macomber signed it, and on March 31,

---

[13] For that reason, this action was commenced by DeSimone and Macomber only. Witham is a party now only because the defendants brought their claims against him for his part in the failed transaction.

13

DeSimone recorded it in the Hancock County Registry of Deeds. Neither the plaintiffs' attorney nor Witham knew of the *lis pendens* or its filing until after the fact.[14] The contents of the document is as follows:

## NOTICE OF PENDING LEGAL PROCEEDINGS

Robert J. DeSimone and Robert W. Macomber, Jr.
v.
Lisa MacQuinn-Tweedie, James K. Tweedie, and New Park Entrance Motel Corporation

**NOTICE** is hereby given that there is a pending binding arbitration proceeding involving title to the real estate known as Park Entrance Motel, located on Hamor Avenue, Hulls Cove, Hancock County, Maine, in accordance with the applicable provisions of the Maine Uniform Arbitration Act, 14 M.R.S.A. Statute 5927 et. seq. as the same may be amended.

Defendants' exhibit 10. The instrument was signed by both plaintiffs. The purpose of the document was to provide record notice to any party who might transact on the property that it was subject to a dispute between the plaintiffs and the defendants. As of the filing date (and, for that matter, to the present day), the parcel point had not been partitioned from the remaining 5 acre parcel that was not subject to the plaintiffs' option rights under the 1996 agreement. As is noted above, in 1996 the parties had arranged for the formulation of a legal description of the point parcel. However, the entire 8 acre parcel remained intact and was never the subject of a partition or outconveyance.

At the time the plaintiffs filed the *lis pendens*, the defendants had not received any offers for the purchase of the motel and the associated property. Roy testified that he was unaware of any prospective purchaser who was interested in submitting an offer to purchase those assets but who decided not do so because of the *lis pendens*. Nonetheless, Roy was the contact between the Tweedies and Ocean Properties, and Roy kept Ocean Properties' representatives apprised of the status of transactions affecting the motel.

---

[14] In fact, Witham first learned of it when he was deposed in this action in September 2000.

On April 1, Roy learned that the *lis pendens* had been filed. He wrote two letters to McArdle over the next week expressing dissatisfaction with the filing and noting that it might form the basis for claims of slander of title and tortious interference with advantageous relations. Plaintiffs' exhibits 38, 39. In the first of those letters, which was written on April 1, Roy did note, "You [McArdle] nominally have arbitration pending with respect to the proposed sale of the point parcel. Whatever your feelings, I cannot help but conclude that it is going to be unsuccessful." Plaintiffs' exhibit 38. McArdle sent a responsive letter in mid-April, defending the accuracy and propriety of the *lis pendens*. McArdle also wrote, ". . .I believe that it is quite obvious that there is currently pending binding arbitration relating to the Park Entrance Motel. If, however, you think that clarification in the Registry is necessary, I would be happy to oblige and file a more detailed document with attachments (i.e., settlement documents, affidavits, and other pertinent material) reflecting the specifics enumerated in this letter." Plaintiffs' exhibit 40. Roy did not take McArdle up on this offer or respond in any other way.

### C. Conclusions of law

The Tweedies contend that by filing the *lis pendens* in the Hancock County Registry of Deeds on March 31, the plaintiffs and Witham are liable for slander of title and tortious interference with advantageous relations.

### 1. Slander of title

> . . .'[S]lander of title' is a form of the tort of injurious falsehood that protects a person's property interest against words or conduct which bring or tend to bring the validity of that interest into question. To prove slander of title a claimant must prove (1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages.

*Colquhoun v. Webber*, 684 A.2d 405, 409 (Me. 1996).

The Tweedies have failed to establish that the plaintiffs filed the *lis pendens* and made the representations contained in that instrument with malice or reckless disregard of its falsity. They have also not established that those statements were false.

15

The defendants acknowledge that an "essential" element of their theory against the plaintiffs and Witham, *see* "Final Argument and Memorandum of Counterclaim Plaintiffs" at p. 5, is based on their contention that the plaintiffs and Witham acted with the intention to keep Ocean Properties at bay and prevent that entity from attaining a posture where it would be able to exercise its conditional right to acquire the motel property, including the motel itself. The persuasive evidence shows that this argument is fallacious.

From the plaintiffs' perspective, the best possible outcome of their dealings with the defendants would be the acquisition of the point parcel, an event accomplished through the exercise of their option created in the 1996 agreement, combined with Witham's leasehold interest in the motel. In this way, the plaintiffs would have the benefit not only of ownership and control of the point parcel but also, through Witham, of an interest in the motel, which was located on the parcel that would adjoin the point parcel after the latter was severed from the former. The relationship between Witham and the plaintiffs also benefited the plaintiffs because of Witham's more substantial resources. The motel itself was out of the plaintiffs' reach without those resources. Witham, with the assistance of the plaintiffs, made a considerable effort to consummate this type of arrangement, but despite the creation of the March 2, 1999, agreement, it could not be accomplished. By the end of March, Witham's interest in pursuing the matter had largely dwindled, despite his investment of $10,000 (the nonrefundable payment tendered when the March 2 agreement was executed), simply because he did not want to be involved in a transaction where the other parties (namely, the Tweedies) did not have a similar interest. Because Witham's participation in the venture was an essential ingredient to the plaintiffs' ability to become involved in the management of the hotel, it could only have been evident to the plaintiffs that they were on their own and that their objective was thereby limited to acquisition of the point parcel.

While the terms of the March 2 agreement embodied the ideal resolution for the plaintiffs, the worst possible outcome was the status quo. Witham, in his final argument, accurately describes the possibility of foreclosure by Union Trust as the plaintiffs' Achilles heel: foreclosure was the only way the plaintiffs could lose their option to acquire the point parcel. As long as the Tweedies remained in ownership and control of

the motel property, Union Trust would foreseeably retain its role as mortgagee. The plaintiffs were aware that the Tweedies had defaulted on a number of terms of the mortgage agreement with Union Trust, and the situation was sufficiently grave that in a written agreement, the Tweedies admitted the violations and the bank agreed to forebear from exercising the rights that were triggered by those breaches, as long as certain conditions were satisfied. Nonetheless, the plaintiffs had real basis for their apprehension that the Tweedies' business relationship with the bank was unstable and that their interest in the point parcel was correspondingly jeopardized. Thus, even though the plaintiffs' result-of-choice (namely, the exercised option combined with Witham's leasehold of the motel) became less likely as time passed in March, the plaintiffs' interest in obtaining the point parcel remained constant.

If Witham could not enter into the long-term lease through the global arrangement embodied in the March 2 agreement, the next best avenue for the plaintiffs and Witham was for the Tweedies and Witham to enter into a purchase and sale agreement for the motel and the 5 acres that were not subject to the plaintiffs' option. If the Tweedies entered into such an agreement, then Ocean Properties would be entitled to match the terms of that agreement. If it chose not to do so, then Witham would acquire the motel and the associated realty, and he and the plaintiffs functionally would be in the same circumstance as if the parties had complied with the March 2 agreement. Alternatively, if Ocean Properties acquired the motel, then because of the amount of proceeds that the Tweedies would receive from that sale, the secured obligation owed to Union Trust would be satisfied, the bank would release its interest in the point parcel, and the plaintiffs could exercise that option and finally acquire that lot. As Macomber testified, even if the motel property ended up in ownership by Ocean Properties, then at least there would have been movement to the plaintiffs' benefit. Indeed, the evidence establishes that after the prospects for a lease had dimmed, the plaintiffs and, for a time, Witham pursued purchase of the motel from the Tweedies. This demonstrates that the plaintiffs were not absolutely intent on excluding Ocean Properties from obtaining the motel, and the reasons for that approach are evident from the record.

For these reasons, the defendants' central theory of the case is not supported by the evidence. When this conclusion is put more squarely in the terms of their claim, they

have not proven that the plaintiffs and Witham recorded the *lis pendens* and made the statements included in that filing with malice.

The Tweedies also contend that the *lis pendens* is actionable because its contents were false in two ways: there was not "pending binding arbitration," and the property identified in the document exceeded the true scope of the parties' dispute. The Tweedies have not demonstrated that these representations were made with knowledge or reckless disregard of their falsity.

First, while its is clear that the parties were not in the midst of arbitration, on a number of occasions the plaintiffs had demanded that the Tweedies submit to that process. On at least several of those occasions, the Tweedies' counsel had agreed, although at other times he expressed skepticism about whether the dispute was in order for that process due to the nature of the mortgagee's role. Nonetheless, counsel for the parties had gone as far as to agree on the identity of the arbitrator. Indeed, the day after the plaintiffs filed the *lis pendens*, Roy wrote to McArdle, "You nominally have arbitration pending with respect to the proposed sale of the point parcel." Plaintiffs' exhibit 38.[15] Therefore, counsel for the Tweedies' himself acknowledged that the foundation for arbitration had proceeded to a point where, at least to some degree, the process was in motion. When all of these circumstances are considered, the court cannot say that the plaintiffs made their statement regarding the status of arbitration between the parties with knowledge that the statement was false or with reckless disregard of its falsity.

Further, the same conclusion must be reached with respect to the plaintiff's identification of the property that subject to the dispute. It is unlikely that the arbitration noted in the *lis pendens* was invoked under the 1999 agreement. Even if Witham and the plaintiffs are viewed as partners in that venture, it remains that the plaintiffs were not parties to the March 2 contract. Therefore, it was not their place to provide notice of

---

[15] In the same letter, Roy used the word "nominally" in a different context: he wrote that James Tweedie "was at least nominally treated for his long-standing drug dependency" after the March 2 agreement was signed. In fact, Tweedie *was* treated for addiction at Acadia Hospital. Therefore, Roy's use of the word "nominally" cannot be discounted as merely a facetious description of a condition that does not exist or an event that did not happen.

18

arbitration regarding an agreement to which they were not signatories. Also, the plaintiffs' attempts to engage in arbitration preceded the creation of the 1999 agreement. Further, the act of recording the *lis pendens* appears to be most responsive to James Tweedie's March 23 threat that the plaintiffs would "never see" the point parcel. The parties had endured the other points of contention for a considerable length of time. Under this factual analysis, the *lis pendens* filed by the plaintiffs could relate only to the agreement to which they were parties, namely, the 1996 agreement. On this basis, the defendants argue that the plaintiffs purposefully but wrongfully included the entire 8 acre parcel within the scope of the *lis pendens*, because in fact under the 1996 agreement, only the point parcel could be in issue. This argument, however, does not account for the fact that the point parcel never was partitioned from the remainder of the 8 acre lot. The parties had agreed to the boundaries of the partition and had commissioned a survey that resulted in a legal description. Nevertheless, the integrity of the whole lot remained unaffected. Therefore, the plaintiffs correctly identified the single parcel that was the subject of their dispute with the Tweedies. The defendants contend that the plaintiffs previously recorded a memorandum of their option rights and that that earlier filing incorporated a description of the point parcel by itself, segregated from the balance of the entire 8 acre lot. The very purpose of that earlier filing, however, was to put the world on notice that the plaintiffs had an option only to a portion of a larger lot. For that reason, the prospective boundaries of that parcel were identified in the filing. When the plaintiffs later chose to put the world on notice of their dispute with the Tweedies, that point parcel remained part of the larger parcel, and the notice then could only relate to the latter, which was the legally recognized lot.

Alternatively, if the arbitration noted in the *lis pendens* was invoked under the 1999 agreement, then it would relate to the entire 8 acre parcel because both the point parcel and the residual 5 acres would be implicated. In that event, the description of the property included in the *lis pendens* also was accurate.

Therefore, for these reasons, the Tweedies have failed to prove at least these elements of their claim for slander of title.

**2. Tortious interference with advantageous relations**

19

The Tweedies' second liability claim against Witham and the plaintiffs is for tortious interference with advantageous relations. To prevail on this theory, the defendants must establish "(1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages." *Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d 1104, 1110.

Here, without reaching the question of causation or damages, the court finds that the defendants have not proven the existence of a valid contract or prospective economic advantage, and that they have also not demonstrated that the plaintiffs and Witham interfered with any such advantage by means of fraud or intimidation.

First, there is no evidence that the Tweedies had entered into a contract for the sale or other disposition of the motel property that was undermined by the *lis pendens*. Roy had maintained contact with a representative of Ocean Properties, but that entity had not extended an offer to the Tweedies, and independent negotiations with it appear to have been foreclosed by the 1996 agreement. Roy was unable to state, during testimony, that the *lis pendens* deterred any party, Ocean Properties or otherwise, from pursuing a transaction with the Tweedies, and there is no evidence from any other source that there existed a prospective advantageous relation.[16]

Second, there is no evidence that the plaintiffs or Witham engaged in intimidation to interfere with any such prospective transaction. *See Rutland*, 2002 ME 98, ¶ 16, 798 A.2d at 1111 (defining intimidation as unlawful coercion or extortion). Further, for the reasons discussed above, the court concludes that neither the plaintiffs nor Witham engaged in fraudulent conduct when the *lis pendens* was filed. *See id.*, ¶ 14, 798 A.2d at 1111 (defining fraud in the conventional manner, including a false representation and either knowledge of that falsity or reckless disregard of whether the statement is true or false).

**D. Conclusion**

---

[16] It appears that the Tweedies intended to present the testimony of a the representative whom Roy used as a contact with Ocean Properties. However, that person was unavailable to testify, and the record was closed without any such evidence.

The parties have raised and argued a series of other points, including the questions of whether Witham can be held liable for the torts of the plaintiffs under a theory of partnership, whether the filing of the *lis pendens* was the legal cause of any damages sustained by the defendants, and whether the defendants have proven any such damages. Because the court concludes that the defendants have not proven any underlying actionable conduct, the court need not – and therefore does not – address these remaining issues.

The question of costs is complicated by the claims that previously were filed and adjudicated in this case, and by the nature of those adjudications. Those adjudicated claims are closely intertwined with the ones addressed here, and it is not realistic to sort them out for the purpose of allocating costs.[17] In light of that difficulty, the court finds it appropriate to award only those costs that were incurred from the time those other claims were resolved.

The entry shall be:

For the foregoing reasons, on the counterclaim, judgment is entered for the counterclaim defendants (Robert J. DeSimone and Robert W. Macomber, Jr.). The counterclaim defendants are awarded their costs incurred subsequent to July 17, 2001.

On the defendants' third-party claim, judgment is entered for the third-party defendant David Witham. The third-party defendant is awarded his costs of court incurred subsequent to November 8, 2000.

Dated: March 16, 2003

_____
Justice, Maine Superior Court

**FILED &
ENTERED**

MAR 2 4 2003

**SUPERIOR COURT
HANCOCK COUNTY**

---

[17] Costs were taken into consideration when the court assessed attorney's fees against the plaintiff and Witham following dismissal of their claims against Roy and his law firm.